# DECLARATION OF MARTIN LUKE MOORE QC

I, Martin Luke Moore QC of Erskine Chambers, 33 Chancery Lane, London WC2A 1EN, state pursuant to 28 U.S.C. §1746:

## A: INTRODUCTION

1. I am a barrister in private practice in London. I was called to the Bar of England and Wales in 1982 and, on completion of my pupillage,[1] became a member of Erskine Chambers in 1983. Erskine Chambers, a set of Barristers Chambers, is widely regarded as the foremost company law Chambers in England and Wales. I was appointed Queens Counsel[2] in 2002. During the course of my practice as a barrister, I have focused on company law litigation and advice, corporate finance, mergers and acquisitions, financial services, insolvency and corporate reorganisations, including the reorganisation of the businesses of banks and insurance and reinsurance companies. I have extensive experience advising companies ranging in size from major multinational public companies to small family companies. As I have become more senior, however, the focus of my practice has moved firmly toward acting for public limited companies, more often than not companies whose securities are publicly traded. I am competent to make this Declaration, and I make this Declaration based on my personal knowledge of the matters recited herein.

2. Exhibit 1 hereto includes a true copy of my profile maintained on Erskine Chambers' website and extracts from *Chambers UK: A Client's Guide to the UK Legal Profession 2016* published by Chambers & Partners, along with the press release for the Chambers & Partners 2016 Awards at which I won the Company and Insolvency Silk of the Year award. Exhibit 2 comprises copies of the statutory materials and cases referred to in this Declaration.

3. I have been asked by Sullivan & Cromwell LLP to make this declaration to address two issues arising out of the declaration of Thomas Lowe QC dated 7 March 2017. I have not been asked to consider the entirety of Mr Lowe's Declaration and accordingly the fact that I do not address many of the points made by Mr Lowe should not be taken as indicating that I either agree or disagree with him in relation to those points.

---

1 My pupil masters were Lord Justice Longmore, as he became, and the late Oliver Weaver QC.

2 The Bar Council of England and Wales' website describes Queen's Counsel as follows: "*A limited number of senior barristers are made Queen's Counsel as a mark of outstanding ability. Most senior judges once practiced as QCs.*"

4. In addition to Mr Lowe's Declaration, I have been provided with a copy of the Second Amended Complaint in *Alameda*. I understand that, as far as is relevant, the relevant parts of the complaints in the other claims take the substantially the same form.

5. In the interests of transparency I wish to make it clear that Douglas Flint, who was until April 2011 a non-executive director of BP is a family friend of mine and is godfather to my youngest daughter, Serena. I have also over the years advised BP on a number of different legal matters relating, for example, to the Remuneration Report and the compliance of its Governance Code with the Companies Act 2006. None of these engagements, apart from those relating to giving my views on English law in relation to derivative and other proceedings in the United States, has been particularly time intensive. To put the matters in context in the period from 1st October 2006 to date my professional fees from all matters for BP amounted to 1.89% of my total fee income in the relevant period, and 0.42% if fees earned on the various declarations and affidavits I have made giving my views on various aspects of English law in proceedings before Courts in the United States and Canada are taken out of account. My wife and I also occasionally accept corporate hospitality from David Jackson, the Company Secretary of BP. I note that Mr Jackson is referred to in certain of the complaints but is not a defendant in any of these actions.

6. I also hold, as part of a wider portfolio of shares which is managed on a discretionary basis by my broker on my behalf, a total of 8000 shares in BP which were bought at prices ranging from £4.46 and £5.69. Those shares were purchased between 21 March 2009 and 6 May 2010.

7. I do not consider that any of the above matters have any bearing on my analysis of the relevant legal principles.

8. It is an important requirement of the Court in England and Wales that persons giving expert evidence owe their duties to the Court to which their evidence is to be tendered and not to the party appointing them. Regardless of whether such a requirement exists in Courts of the United States, I have made this declaration on the same basis as I would were it made in English proceedings.

## B: THE "*PRESUMPTION*" OF INDUCEMENT

9. I am first asked to explain the nature of the "*presumption*" raised by Mr Lowe at paragraph 10(b) of his declaration. English law generally divides presumptions into two classes: presumptions of law and what are sometimes called "*presumptions of fact*"[1]. This terminology

---

1 See for example *Phipson on Evidence*, 2nd Ed. at 1-17 & 6-17 – 6-18.

is not entirely accurate; the leading practitioner text on evidence explains the position as follows:

> "*The term "presumption of fact" however is misleading. Its only use is to describe inferences which the mind naturally and logically draws from given facts, irrespective of their legal effect. Not only are they always rebuttable, but the trier of fact may refuse to make the usual or natural inference, notwithstanding that there is no rebutting evidence.*"[2]

10. Thus, a presumption of fact merely "*describes the readiness of the court to draw certain inferences as a result of common human experience*"[3].

11. One of the reasons why this distinction is important is that, under English conflict of law principles, questions of evidence and procedure are usually governed by the *lex fori*[4]. Thus, when considering whether or not a presumption under foreign law will apply in English proceedings it is necessary to consider the nature of the foreign presumption and whether it is a substantive rule or a mere rule of evidence or procedure. The first stage is to determine whether the "*presumption*" is, as a matter of English law, a presumption of law or a "*presumption of fact*". If the presumption is one of law then difficult questions may arise as to whether it is properly regarded as substantive or procedural[5]. However, no such issues arise in relation to "*presumptions of fact*"; as the leading practitioner text on conflicts of laws issues observes: "*Presumptions of fact have, strictly speaking, no legal effect at all, and need not be considered*" from a conflict of laws perspective.

12. It is clear that the "*presumption*" of inducement referred to by Mr Lowe at paragraph 10(b) of his affidavit is a "*presumption of fact*" or, more accurately, an inference. This was recently confirmed by the Supreme Court in *Zurich Insurance Co plc* v *Hayward*[6], where Lord Clarke explained that: "*As to ... the "presumption" of inducement, it is not a presumption of law but an inference of fact*"[7].

---

2 *Ibid.* at 1-17.

3 *Ibid.* at 6-17(c).

4 *Ibid.* at 1-26 and *Dicey, Morris & Collins*, 15th Ed. At 7-036 – 7-037.

5 See *Dicey, Morris & Collins*, 15th Ed. At 7-036 – 7-037.

6 [2016] UKSC 48.

7 At [34]. See also *Misrepresentation, Mistake and Non-Disclosure*, 4th Ed., Cartwright at 3-53, the discussion in *Deceit: The Lie of the Law*, Eggers at 1.55 and *Smith v Chadwick* (1883-84) 9 App Cas 187 at 196.

13. The result of this is that, were the Court in the present proceedings to adopt the same conflicts of law rules as apply under English law, the "*presumption*" referred to by Mr Lowe would not be relevant: what inference, if any, to draw would be a matter for the *lex fori* and English law as to the appropriate inference would be irrelevant. However, I am not an expert in the law of Texas (or of the any other part of the United States) and therefore do not know what conflicts principles may apply.

14. I also note that Mr Lowe refers to the same "*presumption*" in relation to his analysis of the allegations contained in the complaints (see for example paragraph 73 of his Declaration). First, as I have explained, the relevance of the English inference will depend on the applicable conflict of law rules. Secondly, I would also note that much of Mr Lowe's analysis in this regard appears to be directed to what I would regard as a procedural issue, namely how the relevant allegations should be pleaded. I anticipate that this is likely to be governed by Texan procedural rules and it is not clear to me what relevance, if any, English procedural rules as to pleading have.

15. However, if and to the extent that foreign law may be relevant, I would note that in the recent Scottish case of *Kidd v Paull & Williamsons LLP*[8] the Court held:

> "*The pursuer asserts that if he had been made aware of the conflict of interest, he would have withdrawn his instructions from the first defender and ended the negotiations with Lime Rock. But that is not the same as an averment that the representation, whether express or implied, that the first defender was not acting in conflict of interest, materially influenced the pursuer in his decision to enter into the contract. In the absence of such an averment, there is no scope for application of the presumption. And without the presumption, there is no relevant case pled of reliance by the pursuer on the alleged fraudulent misrepresentation in his decision to sell to Lime Rock.*"

16. Thus, the existence of the presumption did not change what needed to be pleaded. In particular, a claimant could not use the existence of the presumption to advance a claim in circumstances where it could not in fact allege that it had relied on the relevant representation.

17. While this decision was made by a Scottish court and Scottish law is not identical to English law, the reasoning is, in my view, persuasive and the same result would be reached by an English Court. Indeed, the decision in *Smith v Chadwick*[9] is to similar effect because, in that

---

[8] [2017] CSOH 16.

[9] (1883-84) 9 App Cas 187.

case, the Claim failed precisely because, notwithstanding the "*presumption*", the Claimant failed to assert or prove reliance.

18. However, as I say, I anticipate that pleading issues will be governed by the *lex fori* and that English procedural law will not be relevant. I therefore do not address these issues further.

## C: THE HOLDER CLAIMS

19. I am also asked to consider Mr Lowe's opinion as to the quantification of damages in relation to what are described as "*Holder claims*", i.e. claims by persons who already owned shares in BP and are alleged to have refrained from selling such shares on the basis of the alleged misrepresentations. I refer to these claims as the Holder claims and the Plaintiffs bringing them as the Holder claimants.

20. As I explain below, I disagree with Mr Lowe's analysis of the Holder claims at paragraphs 51 and 55 to 58 of his declaration. In my view, that analysis is, as a matter of English law, wrong. In short (and at the risk of somewhat oversimplifying):

(a) The Plaintiffs' case is that the effect of the alleged misrepresentations was to inflate the market price of BP's shares above their true value;

(b) The substance of the Holder claimants complaint is that they were denied the opportunity to sell their shares at that inflated price;

(c) However, on the Plaintiffs' own case, the Holder claimants would never have been able to achieve that inflated price had the misrepresentations not been made and therefore they cannot claim damages for the loss of an opportunity to do something which they could not have done had there been no misrepresentation.

21. I address these points in more detail below. I should also say that this does not mean that a person in a position of the Holder claimants could never have any viable claim to damages but simply that the basis on which the Holder claimants in the present proceedings seek to quantify their loss is not sustainable as a matter of English law.

22. I would start by noting that I agree with Mr Lowe that the object of an award of damages in tort is to put the claimant as nearly as possible in the position in which it would have been if the tort had not occurred[10]. This can be contrasted with the normal contractual measure of

---

[10] See paragraph 4 of Mr Lowe's declaration.

damages, the purpose of which is to put the claimant in the position in which it would have been had the contract been performed.

23. The courts have repeatedly emphasised that these two measures of damages are distinct and should not be confused. Thus, in *Smith New Court Securities Ltd v Citibank NA*[11], Lord Steyn explained that: "*The plaintiff in an action for deceit is not entitled to be compensated in accordance with the contractual measure of damages, i.e. the benefit of the bargain measure. He is not entitled to be protected in respect of his positive interest in the bargain*".

24. Thus, where a tortious claim is based on a misrepresentation, a claimant cannot recover damages to put itself in the position in which it would have been had the misrepresentation been true; it can only recover damages to put itself in the position in which it would have been had no misrepresentation been made.

25. This distinction shows the significant difference, from the perspective of the quantification of damages, between the Holder claims and the claims by persons who are said to have purchased shares in reliance on the alleged misrepresentations. For purchasers, the quantification issue is, in principle, relatively straightforward: the starting point is that such purchasers allege that, in reliance on the alleged misrepresentations, they purchased shares in BP at the market price but that the market price was inflated by the alleged misrepresentations and was in excess of the true value of the shares. Thus, they pursue a claim on the basis that they suffered immediate loss when they purchased such shares for more than their true value, with the loss being the difference between the market value of the shares and the true value of the shares.

26. However, the same argument is not available to persons who allege that they continued to hold shares in reliance on the alleged misrepresentations: such persons already held shares in BP and from their perspective, any allegation that the market price was inflated would not, in and of itself, cause them loss.

27. To take a simple example, on day 1 a person holds 10 shares with a market value of £1. A misrepresentation is made on day 5 (say a knowingly false statement is made that the company has found a new and highly profitable oil well) which causes the market price to increase to £5. On day 10 the misrepresentation is exposed and the market price falls back to £1, with it being found that, absent the misrepresentation, the market price would have remained at £1 throughout.

---

[11] [1997] AC 254 at 281G – 282B. See also *East v Maurer* [1991] 1 WLR 461.

28. In this scenario, a person who purchased shares on day 5 at £5 will have suffered a loss of £4. In contrast, the person who already held shares will not have suffered any loss merely by virtue of the movement in the market price: the true value of his shares will have remained £1 throughout. In my view it is quite clear that such a person could not claim that he has suffered a loss of £4. Absent the misrepresentation, the shares would never have been worth £5 and therefore, in tort, he cannot recover this amount. To assess damages by reference to the price of £5 would be to assess damages by reference to what the price would have been had the misrepresentation been true. However, as I have explained, that is not the measure of damages in tort.

29. Turning to the present case, as I understand it, the basis on which damages are sought for the Holder claims is set out at paragraph 541(d) of the Second Amended Complaint in *Alameda* and is that the Plaintiff is: "*entitled to recover the difference between the price(s) of such securities on the date(s) on which it was induced to continue holding them by the Defendants' deceit alleged herein and the price of such securities on the earlier of (i) the actual date(s) on which Plaintiff sold such securities on or after April 26, 2010 up to and including June 25, 2010; or (ii) the actual dates on which Plaintiff can establish it would have sold such securities but for the Defendants' ongoing deceit*".

30. For the reasons I have given above, this is not the correct approach. The issue is not what the price was as at the date on which the alleged misrepresentation was acted but rather what the value would have been on that date had no misrepresentation been made.

31. In this regard, I would note that *McGregor on Damages*[12], the leading practitioner text on the quantification of damages, observes that: "*An important point, because peculiar to shares, is that care must be taken not to assess the value of the shares at the price at which they stand in the market, since such a price may be a false and artificial one induced by the very deceit of which the claimant is complaining*". The listed price of shares "*is only evidence of value, not proof of it*"[13].

32. Similarly, in *Smith New Court Securities Ltd*, Lord Steyn made clear that[14] "*It is not simply a matter of the perception of the market as to the value of the shares*" as it may be necessary to determine "*the real or true value of the shares, absent the deceit forming the basis of the claim*", although this "*may give rise to difficult hypothetical problems*". Nonetheless, there is

---

12 19th Ed. at 47-013.

13 *Twycross v Grant* (1877) 2 CPD 469.

14 At 278G – 279D.

no "*special rule in respect of share transactions*"[15] and what must be determined remains what payment of money is necessary to put the claimant in the position in which he would have been had the misrepresentation not been made.

33. In the present case, the Plaintiffs make very clear that their case is that the price would have been lower had the alleged misrepresentations not been made. For example, the Plaintiffs assert that the price was "*artificially inflated as a direct result of the Defendants'* [alleged] *materially false and misleading statements and omissions*" (see paragraph 505 of the Second Amended Complaint in *Alameda*) and that there was then "*a correction*" when the true position was revealed (paragraph 506).

34. Accordingly, it is, in my view, clear that damages cannot be quantified on the basis set out in paragraph 541(d).

35. Turning to Mr Lowe's declaration, he states (in paragraph 51) that, in his view, damages on the Holder claims "*can properly be assessed as the difference between the price that prevailed on the day when the shares would have been sold but for the misrepresentation(s) that induced the retention of shares and the true market value at the later date when the Defendants' misrepresentations were exposed*". I would start by noting that this is not the same as the basis on which damages are sought in paragraph 541(d) of the Second Amended Complaint in *Alameda*, although it is not clear to me whether this is deliberate departure by Mr Lowe.

36. Nonetheless, Mr Lowe's formulation suffers from the same error as the complaints, namely using the market price (which on the Plaintiffs' own case was inflated) as the starting point rather than the value which the shares would have had absent the misrepresentation. Accordingly, it is, in my view, incorrect for the same reasons I have given above.

37. Mr Lowe gives two reasons for his view in paragraphs 57 and 58 of his declaration. First (at paragraph 57), he suggests that "*it is not legally relevant to consider the holder's position on the basis that he or anyone else would have known the truth at the time when the Defendant misrepresented the position*" and that "*the fallacy in the Defendants' argument is to suppose that the market price at the very point at which the investment decision is made and which defines the upper comparison of the basic loss is not in fact what it was at the time*".

38. In my view. this is incorrect. As I have explained above, the correct starting point is to consider what the value would have been had no misrepresentation been made and the Plaintiffs' own case is that the alleged misrepresentation caused the market price to be "*artificially inflated*".

---

15 *Ibid.*

The fallacy of Mr Lowe's argument is to assume a market price which, on the Plaintiffs' own case, would never have been the market price absent the misrepresentation.

39. I would add that this is not to consider what the position would have been had a true statement been made but rather to consider what the position would have been had no misrepresentation been made.

40. I would also add that, as I understand it, parts of the Plaintiffs' complaints are based on alleged omissions to speak rather than express misrepresentations. I am not asked to address whether, and to what extent, such omissions could give rise to a viable claim but, assuming that they could, the tort in this context is the failure to speak and therefore any assessment of the damages must start by reference to what would have occurred had there been no tort, i.e. if the true position had been made clear. Accordingly, in relation to these claims, Mr Lowe's criticism is wrong for the additional reason that, had the alleged omission not occurred, the defendant would, *ex hypothesi*, have made clear the true position and, on the theory of the perfect market, the market price would then have factored in that information and reflected the true value of the relevant shares.

41. Mr Lowe's second argument (at paragraph 58) is that "*a holder of shares is in substantially the same position as a purchaser at the time the misrepresentation is made, and there can be no doubt but that the latter has a claim*". However, as I have explained above, from the point of view of the quantification of damages, the Holder claimants are in a very different position to the purchasers. Mr Lowe's argument simply does not address these points.

42. Mr Lowe continues to assert that "*Both a purchaser and a holder are placed in the position, that they lost part of the value of the positions they took in BP securities on the date on which they relied on the Defendants' misrepresentations, whether that decision was to make a new investment or continue holding an existing one*". With the greatest of respect to Mr Lowe, I simply do not understand this argument and, to the extent that I can do so, consider it to be self-evidently wrong. The error can be seen from the simple example I have given at paragraphs 26 & 27 above. The Holder claimants are in a very different position to the purchaser claimants.

43. Further, in so far as I can understand Mr Lowe's reasoning, he appears to be relying on a "*loss*" by the Holder claimants of the opportunity to sell their shares at the artificially inflated price which is said to have resulted from the alleged misrepresentations. However, as I have explained, that is the loss of an opportunity which the Holder claimants would never have had but for the misrepresentation and for which they therefore cannot recover.

44. Indeed, the effect of Mr Lowe's argument is to suggest that the Holder claimants should be compensated for not being able to offload their shares at an inflated price to other market participants who were only prepared to pay that inflated price because they continued to harbour under the misapprehension created by the alleged misrepresentations.

45. To put it another way, Mr Lowe appears to be saying that the Holder claimants can recover their losses by reference to what they would have been able to sell their shares for had the alleged misrepresentation been true. However, that is to confuse the contractual measure of damages with the tortious measure of damages which, as I have explained, is wrong as a matter of principle.

46. As to Mr Lowe's reference to *Caason Investments Pty Ltd v Cao*, in my view that case does not support his argument. First, while English courts will sometimes refer to Australian decisions, such decisions are not binding on English courts and are only of persuasive authority to the extent that their reasoning is relevant to an issue arising in English proceedings. I would also add that English and Australian law diverge in a number of significant respects and therefore the law of Australia cannot simply be taken as being the same as the law of England.

47. This is emphasised by the fact that the judgment in *Caason* relies almost exclusively on Australian decisions rather than English decisions.

48. Secondly, *Caason* concerned a specific Australian statutory provisions[16] with different requirements to the English provisions and common law rules at issue in the present case (for example, under the Australian provision it appears not to be necessary to establish reliance – see paragraph 68 of *Caason* – while under English law it is necessary to do so, as appears to be accepted by Mr Lowe[17]). Accordingly, one must, in my view, exercise significant caution before extrapolating general principles of English law from a decision on a specific Australian statutory provisions. An English court would only be likely to do so where the reasoning in the Australian decision was applicable to the issue arising under English law.

49. Furthermore, the decision in *Caason* does not consider issues of quantification at all. *Caason* simply deals with issues as to market based reliance under the relevant Australian statutory provisions and contains nothing relevant to the issues of quantification of damages. There is therefore no relevant reasoning that could be applied by an English court to the issues arising in the present case.

---

[16] The relevant provisions are set out at paragraph 7 of the first instance decision: [2010] FCA 1410.

[17] See paragraphs 7 – 10 of his Declaration.

50. Thirdly, while the judgment contains little explanation of the underlying facts, it appears from the first instance judgment[18] that it was alleged that the securities held by the holder claimants in that case had become entirely worthless: they were alleged to have suffered "*the loss of the entire capital invested in the*" the relevant shares[19]. Thus, the claim appears to have been that, as a result of the deceptive conduct, the holder claimants continued to hold their shares which then became entirely worthless. The logical basis of such a claim is intelligible (although that does not mean that it would necessarily be successful as a matter of English law). Moreover, such a claim is very different to the one asserted in the present proceedings and does not, in my view, throw any light on the claim asserted in the present proceedings.

51. Accordingly, the judgment in *Caason* does not, in my view, support Mr Lowe's argument.

52. For the reasons I have set out above, I do not consider that the Holder claimants can, as a matter of English law, claim damages on the basis set out in paragraph 541(d) of the Second Amended Complaint in *Alameda*.

**D: CONCLUSION**

53. I am not asked to consider the remainder of Mr Lowe's declaration but remain willing to assist the Court in any further way I can.

SWORN BEFORE ME at the City of London, in the United Kingdom on 21 April 2017.

MATTHEW SPENCER

Commissioner for Taking Affidavits

*(or as may be)*

Martin Luke Moore QC

DAC Beachcroft LLP
100 FETTER LANE
LONDON EC4A 1BN
0207 242 1011

---

18 [2010] FCA 1410.

19 See paragraphs 96, 109 and 119.